**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Christopher Schroeder, individually and on behalf of all
others similarly situated,

              Plaintiff,

v.

Professional Finance Company, Inc., a Colorado corporation

              Defendant.

---

## CLASS ACTION COMPLAINT

---

Plaintiff Christopher Schroeder ("Schroeder" or "Plaintiff Schroeder"), individually and on behalf of all others similarly situated, through undersigned counsel, hereby alleges the following against Defendant Professional Finance Company, Inc. ("Professional Finance Company," "PFC," or "Defendant"). Facts pertaining to Plaintiff and his personal experiences and circumstances are alleged based upon personal knowledge, and all other facts herein are alleged based upon information and belief, *inter alia*, the investigation of Plaintiff's counsel.

### NATURE OF THE ACTION

1.     This is a class action for damages with respect to Professional Finance Company, Inc. operating for its failure to exercise reasonable care in securing and safeguarding both its current and former employees' and its Customers' (defined below) patients' sensitive personal data—including first and last names, addresses, accounts receivable balance, information regarding payments made to accounts, Social Security numbers, health insurance information and medical treatment information (collectively, the "Private Information").

1

2.      This class action is brought on behalf of patients and current and former employees whose sensitive Private Information was stolen by cybercriminals in a cyber-attack on Professional Finance Company's systems that took place in or around February 26, 2022, and which resulted in the access and exfiltration of sensitive patient and employee information (the "Data Breach").

3.      Professional Finance Company reported to Plaintiff and members of the putative "Class" (defined below) that information compromised in the Data Breach included their Private Information.

4.      Plaintiff and Class members were not notified of the data breach until, at the earliest, July of 2022– more than five months after their Private Information was first accessed.

5.      As a result of the Data Breach and Defendant's failure to promptly notify Plaintiff and Class members of the Data Breach, Plaintiff and Class members will likely experience various types of misuse of their Private Information in the coming months and years, including but not limited to, unauthorized credit card charges, unauthorized access to email accounts, identity theft, and other fraudulent use of their Private Information.

6.      There has been no assurance offered by Professional Finance Company that all personal data or copies of data have been recovered or destroyed.

7.      Accordingly, Plaintiff asserts claims for negligence, breach of contract, breach of implied contract, breach of fiduciary duty, declaratory and injunctive relief, and state consumer protection claims.

## PARTIES

**A.      Plaintiff Christopher Schroeder**

8.      Plaintiff Christopher Schroeder is a resident and citizen of Reno, Nevada and brings

this action in his individual capacity and on behalf of all others similarly situated.  Schroeder has received his healthcare services, including doctor and specialist visits, through Renown Health in Reno, Nevada for the past 15 years but otherwise does not have any knowledge as to how PFC could have received or processed his information.  To receive services at PFC, Plaintiff Schroeder was required to disclose his Private Information, which was then entered into PFC's database and maintained without his knowledge. In maintaining his Private Information, Defendant expressly and impliedly promised to safeguard Plaintiff Schroeder's Private Information.  Defendant, however, did not take proper care of Plaintiff Schroeder's Private Information, leading to its exposure to, and exfiltration by, cybercriminals as a direct result of Defendant's inadequate security measures.

9.     In July of 2022, Plaintiff Schroeder received a notification letter from Defendant stating that his Private Information was compromised by cybercriminals.

10.     Plaintiff Schroeder and Class members have faced and will continue to face a certainly impending and substantial risk of a slew of future harms as a result of Defendant's ineffective data security measures, as further set forth herein.  Some of these harms will include fraudulent charges and/or bank and credit accounts opened in the victims' names, medical procedures ordered in patients' names without their permission, and targeted advertising without patient and/or current and former employee consent.

11.     Some of these harms will not materialize for months, or even years after the Data Breach incident, rendering Defendant's notice letter woefully inadequate to prevent the fraud that will continue to occur through the misuse of Class members' information.

12.     Plaintiff Schroeder greatly values his privacy, especially while receiving medical services, and would not have paid the amount that he did to receive medical services had he known that his healthcare providers' data processor, Professional Finance Company, would negligently maintain his Private Information as it did.

**B.     Defendant Professional Finance Company**

13.     Defendant Professional Finance Company provides accounts receivable management services to various organizations, including Renown Health and other healthcare providers (the "Customers"). Professional Finance Company has a principal place of business at 5754 West 11th Street, Suite 100, Greeley, Colorado 80634. Professional Finance Company's corporate policies and practices, including those used for data privacy, are established in, and emanate from Colorado.

**JURISDICTION AND VENUE**

14.     The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

15.     The Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant maintains its principal place of business in this District and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the events or omissions giving rise to the Class's claims also occurred in this District.

## FACTS

17.     Defendant provides accounts receivable management services to various organizations, including Renown Health.  As part of its business, Defendant was entrusted with, and obligated to safeguard and protect the Private Information of, Plaintiff and the Class in accordance with all applicable laws.

19.     In February of 2022, Defendant first learned of an unauthorized activity on its network, which contained its current and former employees' and Customers' patients' Private Information. Defendant posted the following form notice on the Montana Attorney General's data breach monitoring page:[1]

> Professional Finance Company, Inc. ("PFC") provides accounts receivable management services to various organizations, including [REDACTED] We are writing to inform you of an incident that involved your personal information. We take the security of your personal information seriously, and want to provide you with information and resources you can use to protect your information.
>
> What Happened and What Information was Involved:
>
> On February 26, 2022, we detected and stopped a sophisticated ransomware attack, in which an unauthorized third party accessed and disabled some of PFC's computer systems. We immediately engaged a third party forensic firm to assist us with securing the network environment and investigating the extent of any unauthorized activity. Our investigation determined an unauthorized third party accessed certain individual personal information during this incident. On May 5, 2022,PFC notified [REDACTED] of the incident and impacted data. Please be assured that this incident only impacted data on PFC's systems. Therefore, it did not involve [REDACTED]'s network or information systems.

---

[1] *Professional Finance Company Data Breach Notification*, https://media.dojmt.gov/wp-content/uploads/Consumer-Notification-Letter-367.pdf (last visited July 14, 2022) [hereinafter *Data Breach Notice*].

We found no evidence that your information has been specifically misused; however, it is possible that the following information could have been accessed by an unauthorized third party: first and last name, address, accounts receivable balance and information regarding payments made to your account, social security number. Notably, your medical records and financial account or payment card information were not compromised as a result of this incident.

What We Are Doing:

Data security is one of our highest priorities. Upon detecting this incident we moved quickly to initiate a response, which included conducting an investigation with the assistance of IT specialists and confirming the security of our network environment. We wiped and rebuilt affected systems and have taken steps to bolster our network security. We also reviewed and altered our policies, procedures, and network security software relating to the security of our systems and servers, as well as how we store and manage data.

We value the safety of your personal information and are providing you with access to Single Bureau Credit Monitoring services at no charge. These services provide you with alerts for twenty-four (24) months from the date of enrollment when changes occur to your credit file. This notification is sent to you the same day that the change or update takes place with the bureau. In addition, we are providing you with proactive fraud assistance to help with any questions that you might have, or in the event your identity is compromised. These services will be provided by Cyberscout, a leading data protection company.

What You Can Do:

To enroll in Credit Monitoring services at no charge, please log on to https://secure.identityforce.com/benefit/PFC and follow the instructions provided. When prompted, please provide the following unique code to receive services: [REDACTED]. Cyberscout is available Monday through Friday, 6:00am- 6:00pm MDT. Please note the deadline to enroll is October 3, 2022.

We encourage you to take full advantage of this service offering. Cyberscout representatives have been fully versed on the incident and can answer questions or concerns you may have regarding protection of your personal information.

Enclosed you will find additional information regarding the resources available to you, and the steps that you can take to further protect your information

<u>For More Information:</u>

If you have additional questions, please call our dedicated, toll-free line at 1-844-663-3160, Monday through Friday, 6:00am - 6:00pm MDT.

Sincerely,

Professional Finance Company, Inc.

18.     Upon learning of the Data Breach, Defendant investigated and began sending notification of the incident to affected patients and current and former employees.[2]  Plaintiff was not notified that his information was affected in the Data Breach until July of 2022.

19.     In July of 2022, approximately five months after the Data Breach, Defendant first announced that it learned of suspicious activity that allowed one or more cybercriminals to access its computer systems containing patient and employee information. The July 2022 notification that Defendant posted on the Health and Human Services portal did not explain what type of attack had occurred, what type of information had been affected, or any of the other circumstances surrounding the data breach.

20.     In addition, Defendant offered no explanation for the delay between the initial discovery of the Breach and the belated notification to affected patients and employees, which

---

[2] *See Cases Currently Under Investigation*, U.S. DEP'T OF HEALTH & HUMAN SERVS.: BREACH PORTAL, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf [hereinafter *Breach Portal*] (last visited Apr. 19, 2021).

resulted in Plaintiff and Class members suffering harm they otherwise could have avoided had a timely disclosure been made.

21.     Defendant's delay in notifying its employees and its Customers' patients affected by the Data Breach violated the provisions of Colorado Revised Statutes, § 6-1-716, requiring Defendant to provide prompt and direct notice of a data security breach to any affected victims without unreasonable delay, but in no case more than thirty days after the breach occurs.

22.     PFC's notice of the Data Breach was not just untimely but woefully deficient, failing to provide basic details, including but not limited to, how unauthorized parties accessed its networks, whether the information was encrypted or otherwise protected, how it learned of the Data Breach, whether the breach occurred system-wide, whether servers storing information were accessed, and how many victims were affected by the Data Breach.  Even worse, PFC offered only one or two years of identity monitoring to Plaintiff and Class members, which required the disclosure of additional Private Information that PFC had just demonstrated it could not be trusted with.

23.     In light of the types of personal information at issue, and the fact that the Private Information was specifically targeted by cybercriminals with the intent to steal and misuse it, it can be determined that Plaintiff's and Class members' Private Information is being sold on the dark web, meaning that unauthorized parties have accessed, viewed, and exfiltrated Plaintiff's and Class members' unencrypted, unredacted, sensitive personal information, including names, addresses, dates of birth, Social Security numbers, and more as a result of Defendant's lax data security practices and protocols.

24.     The Breach occurred because Defendant failed to take reasonable measures to protect the Private Information it collected and stored. Among other things, Defendant failed to implement data security measures designed to prevent this attack, despite repeated warnings to the healthcare industry, insurance companies, and associated entities about the risk of cyberattacks and the highly publicized occurrence of many similar attacks in the recent past on other healthcare providers.

25.     Defendant disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff and Class members' Private Information was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class members was compromised through unauthorized access by an unknown third party. Plaintiff and Class members have a continuing interest in ensuring that their information is and remains safe.

**A.     Defendant Failed to Maintain Reasonable and Adequate Security Measures to Safeguard Employee and Patient Private Information**

26.     PFC acquires, collects, and stores a massive amount of its Customers' patient's protected Private Information, including healthcare account information and other personally identifiable data. It also acquires, collects, and stores its current and former employees' Private Information.

27.     As a condition of engaging in health-related services with PFC's Customers and/or employment with PFC, PFC requires that its Customers and employees entrust it with the highly confidential Private Information at issue in this action.

28.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private Information, PFC assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' Private Information from disclosure.

29.     Defendant had obligations created by the Health Insurance Portability and Accountability Act (42 U.S.C. § 1320d *et seq.*) ("HIPAA"), Colorado law (Colo. Rev. Stat. § 6-1-716, *et seq.*), industry standards, common law, and representations made to Class members, to keep Class members' Private Information confidential and to protect it from unauthorized access and disclosure.

30.     As evidenced by Defendant's failure to comply with its legal obligations established by HIPAA and Colorado law, Defendant failed to properly safeguard Class members' Private Information, allowing hackers to access their Private Information.

31.     Plaintiff and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant and any of its affiliates would comply with their obligation to keep such information confidential and secure from unauthorized access.

32.     Prior to and during the Data Breach, Defendant promised its employees and Customers' patients that their Private Information would be kept confidential.

33.     Defendant's failure to provide adequate security measures to safeguard the Private Information is especially egregious because Defendant operates in a field which has recently been a frequent target of scammers attempting to fraudulently gain access to highly confidential patient and employee information.

34. In fact, Defendant has been on notice for years that the healthcare industry is a prime target for scammers because of the amount of confidential patient and employee information maintained.

35. Defendant was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information … and/or Personally Identifiable Information ..."[3]

36. The American Medical Association ("AMA") has also warned companies like Defendant about the importance of protecting confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[4]

37. The number of US data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[5] In 2017, a new record high of 1,579 breaches were reported—representing a 44.7 percent increase.[6] That trend continues.

---

[3] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warnshealthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.
[4] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.
[5] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), https://www.idtheftcenter.org/surveys-studys.
[6] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review*, https://www.idtheftcenter.org/2017-data-breaches/.

38.     The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[7] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[8] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[9]

39.     A 2017 study conducted by HIMSS Analytics showed that email was the most likely cause of a data breach, with 78 percent of providers stating that they experienced a healthcare ransomware or malware attack in the past 12 months.

40.     Healthcare related data breaches continued to rapidly increase into 2022 when PFC was breached.[10]

41.     In the Healthcare industry, the number one threat vector from a cyber security standpoint is phishing. Cybersecurity firm Proofpoint reports that "phishing is the initial point of compromise in most significant [healthcare] security incidents, according to a recent report from the Healthcare Information and Management Systems Society (HIMSS). And yet, 18% of

---

[7] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report*, https://www.idtheftcenter.org/2018-data-breaches/.
[8] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for- victims/.
[9] *Id.*
[10] *2019 HIMSS Cybersecurity Survey*, https://www.himss.org/2019-himsscybersecurity-survey.

healthcare organizations fail to conduct phishing tests, a finding HIMSS describes as "incredible."[11]

42.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precaution for protection."[12]

43.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program.  Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege; no users should be assigned administrative

---

[11] Aaron Jensen, *Healthcare Phishing Statistics: 2019 HIMSS Survey Results*, PROOFPOINT (Mar. 27, 2019), https://www.proofpoint.com/us/security-awareness/post/healthcare-phishingstatistics-2019-himss-survey-results.
[12] *See How to Protect Your Networks from RANSOMWARE*, FBI (2016) https ://www. fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

44.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks . . .

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . .

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it . . .

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic . . .[13]

---

[13] *See Security Tip (ST19-001) Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (Apr. 11, 2019), https://us-cert.cisa.gov/ncas/tips/ST19-001.

45. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
  - Apply the latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privilege credentials;

- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**
  - use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**
  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[14]

---

[14] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT (Mar. 5, 2020),

46.     These are basic, common-sense email security measures that every business, not only healthcare businesses, should be doing.  Professional Finance Company, with its heightened standard of care should be doing even more. But by adequately taking these common-sense measures, PFC could have prevented this Data Breach from occurring.

47.     Charged with handling sensitive personal information, including healthcare information, PFC knew, or should have known, the importance of safeguarding its employees' and Customers' patients' Private Information that was entrusted to it, and of the foreseeable consequences if its data security systems were breached.  This includes the significant costs that would be imposed on the patients in PFC's database as a result of a breach.  PFC failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

48.     With respect to training, PFC specifically failed to:

- Implement a variety of anti-ransomware training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;

- Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and

- Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

49.     The Private Information was also maintained on PFC's computer system in a condition vulnerable to cyberattacks such as through the infiltration of Defendant's systems through ransomware attacks.  The mechanism of the cyberattack and the potential for improper

---

https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-apreventable-disaster/.

disclosure of Plaintiff and Class members' Private Information was a known risk to PFC, and thus PFC was on notice that failing to take reasonable steps necessary to secure the Private Information from those risks left the Private Information in a vulnerable position.

**B.    The Monetary Value of Privacy Protections and Private Information**

50.    The fact that Plaintiff and Class members' Private Information was stolen means that Class members' information is likely for sale by cybercriminals and will be misused in the future.

51.    At all relevant times, Defendant was well aware that Private Information it collects from Plaintiff and Class members is highly sensitive and of significant value to those who would use it for wrongful purposes.

52.    Private Information is a valuable commodity to identity thieves.   As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[15]  Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information including sensitive health information on multiple underground Internet websites, commonly referred to as the dark web.

53.     At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.  Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[16]

---

[15]    Federal    Trade    Commission,    *Warning    Signs    of    Identity    Theft*    (Sept.    2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft .

16 *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

54.     Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[17]

55.     The FTC has also recognized that consumer data is a new (and valuable) form of currency.   In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency.  The larger the data set, the greater potential for analysis—and profit.[18]

56.     Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[19]  The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information.  And, by making the transaction transparent, consumers will make a profit from their Private Information.  This business has created a new market for the sale and purchase of this valuable data.

57.     Consumers place a high value not only on their Private Information, but also on the privacy of that data.  Researchers have begun to shed light on how much consumers value their

---

[17] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703535290 [hereinafter *Web's New Hot Commodity*].
[18] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_ statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.
19 *Web's Hot New Commodity*, *supra* note 17.

data privacy, and the amount is considerable.  Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[20]

58.     The value of Plaintiff and Class members' Private Information on the black market is substantial. Sensitive health information can sell for as much as $363.[21] This information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

59.     Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[22]

60.     The ramifications of PFC's failure to keep its employees', as well as its Customers' patients', Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for 6 to 12 months or even longer.

---

20 *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].
21 Center for Internet Security, *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/.
22 Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/.

61.     Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[23] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[24]

62.     Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[25] Indeed, when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[26] Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[27]

---

[23] *See Medical ID Theft Checklist*, IDENTITYFORCE https://www.identityforce.com/blog/medical-id-theft-checklist-2.
[24] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, EXPERIAN, (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[25] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report*, (2019) https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.
[26] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for- victims/.
[27] *Id.*

63.    At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.  Defendant should have particularly been aware of these risks, given the significant number of data breaches affecting the health care industry and related industries.

64.    Had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the ransomware attack into its systems and, ultimately, the theft of the Private Information of current and former employees and its Customers' patients within its systems.

65.    The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute [personally identifiable information]."[28] For example, different elements of personally identifiable information and/or protected health information from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[29] Based upon information and belief, the unauthorized parties will utilize the Private

---

[28] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework.
[29] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class members that can be misused.

66. In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

67. Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiff and Class members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

68. Given these facts, any company that transacts business with customers and then compromises the privacy of customers' highly sensitive personal information has thus deprived customers of the full monetary value of their transaction with the company.

69. Acknowledging the damage to Plaintiff and Class members, Defendant instructed affected victims of the Data Breach like Plaintiff to "always remain vigilant and monitor your accounts for suspicious or unusual activity." Plaintiff and Class members now face a greater risk of identity theft.

70. In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

## C.      Professional Finance Company's Conduct violated HIPPA

71.      HIPAA requires covered entities like PFC protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[30]

72.      Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

73.      The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[31]

74.      Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. PFC's security failures include, but are not limited to, the following:

- Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

- Failing to implement technical policies and procedures for electronic information systems that maintain electronic

---

[30]   *What is Considered Protected Health Information Under HIPAA?*, HIPPA JOURNAL, https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/.
[31]   *Breach Notification Rule*, U.S. DEP'T HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html.

protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

- Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

- Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

- Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

- Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

- Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

- Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

- Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

- Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

## D.     Professional Finance Company Failed to Comply with FTC Guidelines

75.     PFC was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

76.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[32]

77.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[33] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

78.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for

---

[32] *Start With Security: A Guide for Business*, FED. TRADE. COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf [hereinafter *Start with Security*].
[33] *Protecting Personal Information: A Guide for Business*, FED. TRADE. COMM'M (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf- 0136_proteting-personal-information.pdf.

suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[34]

79.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

80.     PFC was at all times fully aware of its obligation to protect the Private Information of the current and former employees and of its Customers' patients in its database because of its position as a healthcare data processor.  PFC was also aware of the significant repercussions that would result from its failure to do so.

81.     As evidenced by Defendant's failure to comply with its legal obligations established by the FTC Act, Defendant failed to properly safeguard Class members' Private Information, allowing hackers to access their Private Information

**E.     PFC Failed to Comply with Healthcare Industry Standards**

82.     HHS's Office for Civil Rights has stated:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[35]

---

[34] *Start with Security*, *supra* note 32.
[35] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.

83.     HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of Private Information; (b) educating and training healthcare employees on how to protect Private Information; and (c) correcting the configuration of software and network devices.

84.     Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because the of the value of the Private Information which they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats.[36] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Private Information.

85.     Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, PFC chose to ignore them. These best practices were known, or should have been known by PFC, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Private Information.

**F.     Damages to Plaintiff and the Class**

86.     Plaintiff and the Class have been damaged by the compromise of their Private Information in the Data Breach.

87.     The ramifications of PFC's failure to keep employee and patient Private Information secure are long lasting and severe.  Once Private Information is stolen, fraudulent use

---

[36] *See, e.g., 10 Best Practices For Healthcare Security*, INFOSEC, https://resources.infosecinstitute.com/topics/healthcare-information-security/#gref.

of that information and damage to the victims may continue for years.  Consumer victims of data breaches are more likely to become victims of identity fraud.[37]

88.     In addition to their obligations under state and federal laws and regulations, Defendant owed a common law duty to Plaintiff and Class members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

89.     Defendant further owed and breached its duty to Plaintiff and Class members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

90.     As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise commit the identity theft and misuse of Plaintiff and Class members' Private Information as detailed above, and Plaintiff and members of the Class are at a heightened and increased substantial risk of suffering, identity theft and fraud.

91.     The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars

---

[37] *2014   LexisNexis   True   Cost   of   Fraud   Study*, LEXISNEXIS   (Aug.   2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

92.     Some of the injuries and risks associated with the loss of personal information have already manifested themselves in Plaintiff and other Class members' lives. Plaintiff Schroeder received a cryptically written notice letter from Defendant stating that his information was released, and that he should remain vigilant for fraudulent activity on his accounts, with no other explanation of where this information could have gone, or who might have access to it. Additionally, he has already spent hours on the phone trying to determine what additional negative effects may occur from the loss of his personal information, and now faces a certainly impending and substantial risk of a slew of future harms.

93.     Plaintiff and the Class have suffered or face a substantial risk of suffering out-of-pocket fraud losses such as fraudulent charges on online accounts, credit card fraud, applications for benefits made fraudulent in their names, loans opened in their names, medical services billed in their names, and identity theft.

94.     Plaintiff and Class members have, may have, and/or will have incurred out of pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

95.     Plaintiff and Class members did not receive the full benefit of their bargain when paying for medical services, and instead received services that were of a diminished value to those described in their agreements with their respective healthcare institutions, which healthcare institutions entered into agreements with PFC that were made solely for the benefit of Plaintiff and Class members. Plaintiff and Class members were damaged in an amount at least equal to the

difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

96.    Plaintiff and Class members would not have obtained services from their medical providers had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

97.    Plaintiff and the Class will continue to spend significant amounts of time to monitor their financial and medical accounts for misuse.

98.    The theft of Social Security Numbers is particularly detrimental to victims.  The U.S. Social Security Administration ("SSA") warns that "[i]dentity theft is one of the fastest growing crimes in America."[38]  The SSA has stated that "[i]dentity thieves can use your number and your good credit to apply for more credit in your name.  Then, they use the credit cards and don't pay the bills, it damages your credit.  You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought."[39]  In short, "[s]omeone illegally using your Social Security number and assuming your identity can cause a lot of problems."[40]

99.    In fact, a new Social Security number is substantially less effective where "other personal information, such as [the victim's] name and address, remains the same" and for some victims, "a new number actually creates new problems.  If the old credit information is not

---

[38] *Identity Theft And Your Social Security Number*, SOCIAL SECURITY ADMIN. (Dec. 2013), http://www.ssa.gov/pubs/EN-05-10064.pdf.
[39] *Id.*
[40] *Id.*

associated with your new number, the absence of any credit history under your new number may make it more difficult for you to get credit."[41]

100.     Identity thieves can use the victim's Private Information to commit any number of frauds, such as obtaining a job, procuring housing, or even giving false information to police during an arrest.   In the healthcare industry context, Private Information can be used to submit false insurance claims. As a result, Plaintiff and Class members may face a real and continuing immediate risk of identity theft and other problems associated with the disclosure of their Social Security numbers and will need to monitor their credit for an indefinite duration. For Plaintiff and Class members, this risk creates unending feelings of fear and annoyance. Private information is especially valuable to identity thieves. Defendant knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

101.     As a result of the Data Breach, Plaintiff and Class members' Private Information has diminished in value.

102.     The Private Information belonging to Plaintiff and Class members is, as its name suggests, private, and was left inadequately protected by Defendant who did not obtain Plaintiff or Class members' consent to disclose such Private Information to any other person as required by applicable law and industry standards.   Defendant disclosed information about Plaintiff and the Class that was of an extremely personal and sensitive nature as a direct result of its inadequate security measures.

---

[41] *Id.*

103.   The Data Breach was a direct and proximate result of Defendant's failure to: (a) properly safeguard and protect Plaintiff and Class members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff and Class members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

104.   Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect employee and patient data.

105.   Defendant did not properly train its employees, particularly its information technology department, to timely identify and/or avoid ransomware attacks.

106.   Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiff and Class members' Private Information.

107.   As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

108.   The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a

month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[42]

109.    Other than offering 12 or 24 months of credit monitoring to some class members, Defendant did not take any measures to assist Plaintiff and Class members other than telling them to simply do the following:

- remain vigilant for incidents of fraud and identity theft;

- review account statements and monitor credit reports for unauthorized activity;

- obtain a copy of free credit reports;

- contact the FTC and/or the state Attorney General's office;

- enact a security freeze on credit files; and

- create a fraud alert.

None of these recommendations, however, require Defendant to expend any effort to protect Plaintiff and Class members' Private Information.

110.    Defendant's failure to adequately protect Plaintiff and Class members' Private Information has resulted in Plaintiff and Class members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money–while Defendant sits by and does nothing to assist those affected by the incident. Instead, as PFC's Data Breach Notice indicates, it is putting the burden on Plaintiff and Class members to discover possible fraudulent activity and identity theft.

---

[42] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

111.   While Defendant offered one or two years of credit monitoring to some class members, this service does not guarantee the safety of class members' information. Thus, to mitigate harm, Plaintiff and Class members are now burdened with indefinite monitoring and vigilance of their accounts.

112.   Moreover, the offer of 12 months of identity monitoring to some Class members is woefully inadequate. While some harm has already taken place, the worst is yet to come. There may be a time lag between when harm occurs versus when it is discovered, and between when Private Information is acquired and when it is used. Furthermore, identity theft monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's Private Information) – it does not prevent identity theft.[43] This is especially true for many kinds of medical identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

113.   Plaintiff and Class members have been damaged in several other ways as well. Plaintiff and Class members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information. Plaintiff and Class members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming task. Plaintiff and Class members have also been forced to purchase adequate credit reports, credit monitoring and other identity protection services, and have placed credit freezes and fraud alerts on their credit reports, while also spending significant time investigating and disputing fraudulent or suspicious activity on their

---

[43] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-beworth-the-cost.html.

accounts. Plaintiff and Class members also suffered a loss of the inherent value of their Private Information.

114.    The Private Information stolen in the Data Breach can be misused on its own or can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Private Information to send spear-phishing emails to Class members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

115.    As a result of Defendant's failures to prevent the Data Breach, Plaintiff and Class members have suffered, will suffer, and are at increased risk of suffering:

- The compromise, publication, theft and/or unauthorized use of their Private Information;

- Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

- Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

- The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the Private Information in its possession;

- Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and

36

repair the impact of the Data Breach for the remainder of the
lives of Plaintiff and Class members; and

- Anxiety and distress resulting fear of misuse of their Private
  Information.

116.    In addition to a remedy for the economic harm, Plaintiff and Class members

maintain an undeniable interest in ensuring that their Private Information remains secure and is

not subject to further misappropriation and theft.

## CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action individually and on behalf of all other persons similarly

situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or

23(c)(4).

118.    Specifically, Plaintiff proposes the following Nationwide Class, as well as a Nevada

Subclass (collectively, the "Class") definitions:

> **Nationwide Class**
> All persons residing in the United States whose Private Information
> was compromised as a result of the Data Breach discovered on or
> about February of 2022 and who were sent notice of the Data
> Breach.
>
> **Nevada Subclass**
> All persons residing in Nevada whose Private Information was
> compromised as a result of the Data Breach discovered on or about
> February of 2022 and who were sent notice of the Data Breach.

Excluded from the Class are Defendant and Defendant's affiliates, parents, subsidiaries,

employees, officers, agents, and directors.  Also excluded are any judicial officers presiding over

this matter and the members of their immediate families and judicial staff.

119.    Plaintiff reserves the right to modify, change, amend, or expand the definitions of

the Nationwide Class and Nevada Subclass based upon discovery and further investigation.

120.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

121.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).**   The members of the Class are so numerous that joinder of all Class members would be impracticable.  On information and belief, the Class numbers in the hundreds of thousands. Moreover, the Class is composed of an easily ascertainable set of individuals and entities who were current and former employees and/or Defendant's Customers' patients in Defendant's computer systems and who were impacted by the Data Breach. The precise number of Class members can be further confirmed through discovery, which includes Defendant's records. The disposition of Plaintiff and Class members' claims through a class action will benefit the parties and this Court.

122.    **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class.  Such common questions of law or fact include, *inter alia*:

- Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

- Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

- Whether Defendant properly implemented its purported security measures to protect Plaintiff and the Class's Private Information from unauthorized capture, dissemination, and misuse;

- Whether Defendant took reasonable measures to determine the extent of the Data Breach after it first learned of same;

- Whether Defendant disclosed Plaintiff and the Class's Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;

- Whether Defendant willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff and the Class's Private Information;

- Whether Defendant was negligent in failing to properly secure and protect Plaintiff and the Class's Private Information;

- Whether Defendant was unjustly enriched by its actions; and

- Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

123.   Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of themselves and other members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

124.   **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all Class members were similarly injured and sustained similar monetary and economic injuries as a result of Defendant's uniform misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendant that are unique to Plaintiff.

125.   **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class he seeks to represent, he retained counsel competent and experienced in

complex class action litigation, and Plaintiff will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

126. **Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

127. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

128. Class certification is also appropriate under Rules 23(b)(1) and/or (b)(2) because:

    a. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendant;

b.   The prosecution of separate actions by individual Class members would create a risk of adjudication that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and

c.   Defendant has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the members of the Class as a whole.

129.   Class certification is also appropriate because this Court can designate particular claims or issues for class-wide treatment and may designate multiple subclasses pursuant to Fed. R. Civ. P. 23(c)(4).

130.   No unusual difficulties are likely to be encountered in the management of this action as a class action.

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Nevada Subclass)**

131.   Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

132.   Upon Defendant's accepting and storing the Private Information of Plaintiff and the Class in its computer systems and on its networks, Defendant undertook and owed a duty to Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so.  Defendant knew that the Private Information was private and confidential and should be protected as private and confidential.

133.    Defendant owed a duty of care not to subject Plaintiff and the Class's Private Information to an unreasonable risk of exposure and theft because Plaintiff and the Class were foreseeable and probable victims of any inadequate security practices.

134.    Defendant owed numerous duties to Plaintiff and the Class, including the following:

- to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;

- to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

- to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

135.    Defendant also breached its duty to Plaintiff and Class members to adequately protect and safeguard Private Information by disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information.  Furthering its dilatory practices, Defendant failed to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Plaintiff and Class members' Private Information and potentially misuse the Private Information and intentionally disclose it to others without consent.

136.    Defendant knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches within the medical industry.

137.     Defendant knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiff and Class members' Private Information.

138.     Defendant breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff and Class members' Private Information.

139.     Because Defendant knew that a breach of its systems would damage thousands of its current and former employees and Customers' patients, including Plaintiff and Class members, Defendant had a duty to adequately protect its data systems and the Private Information contained thereon.

140.     Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class members, which is recognized by laws and regulations including but not limited to common law.  Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

141.     In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

142.     Defendant also had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any

entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

143.    Furthermore, Defendant had a duty under Colo. Rev. Stat § 6-1-716, *et seq*., to ensure that all medical records and communications in its possession were kept confidential.

144.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

145.    Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Private Information.  Defendant's misconduct included failing to: (1) secure Plaintiff and Class member's Private Information; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

146.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class members' Private Information, and by failing to provide timely notice of the Data Breach.  The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

   a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

   b.  Failing to adequately monitor the security of Defendant's networks and systems;

   c.  Allowing unauthorized access to Class members' Private Information;

   d.  Failing to detect in a timely manner that Class members' Private Information had been compromised; and

     e.   Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages

147.    Through Defendant's acts and omissions described in this Complaint, including its failure to provide adequate security and failure to protect Plaintiff and Class members' Private Information from being foreseeably captured, accessed, disseminated, stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiff and Class members' Private Information during the time it was within Defendant's possession or control.

148.    Defendant's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to failing to adequately protect the Private Information and failing to provide Plaintiff and Class members with timely notice that their sensitive Private Information had been compromised.

149.    Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

150.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members suffered damages as alleged above.

151.    Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all Class members.

**<u>COUNT II</u>**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Nevada Subclass)**

152.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

153.    Plaintiff brings this claim for breach of third-party beneficiary contract against PFC in the alternative to Plaintiff's claim for breach of implied contract

154.    Professional Finance Company entered into a contract to provide accounts receivable management services to its Customers, including Renown Health.  Upon information and belief, this contract is virtually identical to the contracts entered into between Professional Finance Company and its other medical provider Customers around the country whose patients were also negatively impacted by the Data Breach.

155.    These contracts were made expressly for the benefit of Plaintiff and the Class, as it was their confidential medical information that PFC agreed to collect and protect through its services.  Thus, the benefit of collection and protection of the Private Information belonging to Plaintiff and the Class was the direct and primary objective of the contracting parties.

156.    PFC knew that if it were to breach these contracts with its Customers, the Customers' patients, including Plaintiff and the Class, would be harmed by, among other harms, fraudulent transactions.

157.    PFC breached its contracts with its Customers affected by this Data Breach when it failed to use reasonable data security measures that could have prevented the Data Breach.

158.    As foreseen, Plaintiff and the Class were harmed by PFC's failure to use reasonable security measures to store their patient information, including but not limited to, the risk of harm through the loss of their Private Information.

159.    Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with their costs and attorney fees incurred in this action.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Nevada Subclass)**

160.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

161.    In taking possession and control over Plaintiff's and Class members' Private Information, Defendant was obligated to act in good faith and with due regard for the interests of Plaintiff and Class members to safeguard and keep confidential that Private Information.

162.    Defendant accepted the special confidence its Customers and Plaintiff and Class members placed in it, as evidenced by its assertion that it is committed to protecting the privacy of Plaintiff's and Class members' personal information as stated in the Data Breach notification letter.

163.    In light of the special relationship between Defendant and Plaintiff and Class members, whereby Defendant became a guardian of Plaintiff and Class members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of Plaintiff and Class members for the safeguarding of Plaintiff and Class members' Private Information.

164.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members – in particular, to keep secure their Private Information.

165.    Defendant breached its fiduciary duties to Plaintiff and Class members by failing to protect the integrity of the systems containing Plaintiff and Class members' Private Information.

166.    Defendant breached its fiduciary duties to Plaintiff and Class members by otherwise failing to safeguard Plaintiff and Class members' Private Information.

167.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information;  (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the  remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of the services they paid for and received.

168.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class members will suffer other forms of injury and/or harm, and other economic and non-economic losses.

### COUNT IV
### Violations of the Nevada Consumer Fraud Act
### (On Behalf of Plaintiff and the Nevada Subclass)

169.    Plaintiff realleges, as if fully set forth, the allegations of the proceeding paragraphs.

170.    Plaintiff brings this claim against Defendant on behalf of the Nevada Subclass.

48

171.    In the course of its business operations in Nevada, Defendant engaged in deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to its employment and/or business affiliation with persons in the State of Nevada in violation of Nev. Rev. Stat. § 598.0915. Defendant also violated NRS 598.0923(3) because it violated state laws in connection with goods or services (i.e., the accounts receivable services it provided). Defendant's misrepresentations included but are not limited to the following:

a.   Defendant misrepresented material facts, pertaining to the storing of Plaintiff's Private Information, to the Nevada Subclass by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Nevada Class Members' Private Information from unauthorized disclosure, release, data breaches, and theft, in violation of Nev. Rev. Stat. § 598.0915(15);

b.   Defendant misrepresented material facts, pertaining to the storage of the personal data belonging to the Nevada Subclass by representing by implication that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Nevada Subclass Members' Private Information, in violation of Nev. Rev. Stat. § 598.0915(15);

c.   Defendant omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Nevada Subclass Members' Private Information in violation of Nev. Rev. Stat. § 598.0915(15);

d.   Defendant engaged in deceptive trade practices with respect to its employment of, and/or business affiliation with, Nevada Subclass Members' and the Private Information of those Subclass Members, in violation of duties imposed by and

public policies reflected in applicable federal and state laws, resulting in the Data Breach. These unfair acts and practices violated duties imposed by laws including the 15 U.S.C. § 45, NRS 603A.210;

e.   Defendant engaged in deceptive trade practices by failing to disclose the Data Breach to Nevada Subclass Members in a timely and accurate manner in their July communications and thereafter, in violation of NRS 603A.220(1);

f.   Defendant engaged in deceptive trade practices by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Nevada Subclass Members' Private Information from further unauthorized disclosure, release, data breaches, and theft.

g.   Defendant violated NRS 598.0923(3) because their violations of the FTCA, NRS 603A, and NRS 598.0915(15) constituted a violation of a state or federal law.

172.   The above unlawful deceptive acts and practices by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to patients, which injury they could not reasonably avoid; this substantial injury outweighed any benefits to patients or to competition.

173.   Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Nevada Subclass members' Private Information and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Nevada Subclass.

174.    As a direct and proximate result of Defendant's deceptive practices, Nevada Subclass members suffered injury and/or damages.

175.    Under NRS 41.600, violation of either NRS 598.0915 or NRS 598.0923(3) constitutes actionable "consumer fraud."

176.     Nevada Subclass Members seek relief under Nev. Rev. Stat. Ann. § 41.600, including, but not limited to, injunctive relief, other equitable relief, actual damages, and attorneys' fees and costs.

177.    Plaintiff also seeks a declaration that Defendant's existing security measures do not comply with their obligations under the FTCA, NRS 603A, and any other applicable federal or state law. Plaintiff seeks to enforce this declaratory relief through an affirmative injunction which requires the following:

  a.  Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

  b.  Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

  c.  Ordering that Defendant audit, test, and train their security personnel regarding any new or modified procedures;

  d.  Ordering that Defendant segment the highly sensitive employee and patient data by, among other things, creating firewalls and access controls so that if one area of

Defendant is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.   Ordering that Defendant purge, delete, and destroy in a reasonably secure manner all Private Information not necessary for their provisions of services;

f.   Ordering that Defendant conduct regular database scanning and securing checks;

g.   Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.   Ordering Defendant to meaningfully educate its Customers about the threats they face as a result of the loss of their patients' financial and personal information to third parties, as well as the steps Defendant's Customers, as well as the patients and current and former employees impacted by the Data Breach, must take to protect themselves.

## COUNT V
## DECLARATORY RELIEF
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Nevada Subclass)**

178.   Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

179.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

180.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff and Class members' Private Information, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from future data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their Private Information will occur in the future.

181.    The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect employee and patient Private Information.

182.    Defendant still possesses the Private Information of Plaintiff and the Class.

183.    To Plaintiff's knowledge, Defendant has made no announcement that it has changed its data storage or security practices relating to the Private Information.

184.    To Plaintiff's knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

185.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at PFC. The risk of another such breach is real, immediate, and substantial.

186.    The hardship to Plaintiff and Class members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at PFC, Plaintiff and Class members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying

with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

187. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at PFC, thus eliminating the additional injuries that would result to Plaintiff and Class members, along with other patients and/or current and former PFC employees whose Private Information would be further compromised.

188. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Professional Finance Company implement and maintain reasonable security measures, including but not limited to the following:

a. Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on PFC's systems on a periodic basis, and ordering PFC to promptly correct any problems or issues detected by such third-party security auditors;

b. engaging third-party security auditors and internal personnel to run automated security monitoring;

c. auditing, testing, and training its security personnel regarding any new or modified procedures;

d. purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

e. conducting regular database scans and security checks; and

f.    routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in favor of Plaintiff and the Class and against Defendant, as follows:

A.    For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff and Class members' Private Information, and from failing to issue prompt, complete and accurate disclosures to Plaintiff and Class members;

C.    For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to patient and employee data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

D.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.    Ordering Defendant to pay for no less than three (3) years of credit monitoring services for Plaintiff and the Class;

55

F.      For an award of actual damages, compensatory damages, statutory damages, and

statutory penalties, in an amount to be determined, as allowable by law;

G.      For an award of punitive damages, as allowable by law;

H.      For an award of attorneys' fees and costs, and any other expense, including expert

witness fees;

I.      Pre- and post-judgment interest on any amounts awarded; and

J.      Such other and further relief as this court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated:  July 18, 2022                    Respectfully submitted,


                                          _/s/ *Jason S. Rathod*
                                         Jason S. Rathod
                                         (permanently admitted to D. Col.)
                                         Nicholas A. Migliaccio
                                         (permanently admitted to D. Col.)
                                         Tyler Bean
                                         (*pro hac vice* admission to be sought)
                                         Kevin Leddy
                                         (*pro hac vice* admission to be sought)
                                         MIGLIACCIO & RATHOD, LLP
                                         412 H Street, NE, Suite 302
                                         Washington, DC  20002
                                         Phone: 202-470-520
                                         Fax: 202-800-2730
                                         Email: jrathod@classlawdc.com